**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED

OCT 1 0 2013

U.S. COURT OF
FEDERAL CLAIMS

JOSEPH A. DECK, JR.                        )
                                           )   No._____
                                           )
For Himself and As Representative of       )
A Class of Similarly Situated Persons      )
                                           )
            Plaintiff,                     )
                                           )   13-789 L
            vs.                            )
                                           )
THE UNITED STATES OF AMERICA,              )
                                           )
            Defendant.                     )

## CLASS ACTION COMPLAINT

Pursuant to Rule of the Court of Federal Claims ("RCFC") 3, Plaintiff states the following in support of his Class Action Complaint:

### SUMMARY OF THIS CASE

The Plaintiff is the fee owner of property in Erie County, New York. In the early 1900s, the Buffalo, Rochester, and Pittsburgh Railroad ("BR&P") acquired a 27.6 mile easement for the operation of a railroad from Orchard Park in Erie County, New York to Ashford in Cattaraugus County, New York. In 1988, the Buffalo & Pittsburgh Railroad, Inc. ("Railroad") acquired the railroad corridor and was the last railroad to operate along this corridor.

This railroad easement was granted for the operation of a railroad and not for any other purpose. Under the terms of the relevant easement instruments and under New York law, once the Railroad ceased operating a railroad across the right-of-way, the railroad easement was abandoned and Plaintiff as the fee owner regained his right to the exclusive use and physical possession of his property.

Section 8 (d) of the 1983 amendments to the National Trails System Act, 16 U.S.C. § 1247(d) ("Trails Act"), provides the issuance of a Notice of Interim Trail Use ("NITU") by the Surface Transportation Board ("STB") forestalls the Plaintiff property owner's "reversionary"[1] property rights and allows Plaintiff's property to be transferred to a trail user notwithstanding whatever "reversionary" interest Plaintiff has to his property under New York law.

The STB issued a NITU affecting this abandoned railroad right-of-way on November 4, 2008. Pursuant to the Trails Act and this NITU, the Railroad entered into negotiations with the New York State Office of Parks, Recreation and Historic Preservation (the "State of New York") for acquisition of an easement for a public-access recreational trail to be located on the abandoned railroad corridor. Under the terms of the original railroad easement and under New York law, the Railroad does not own or possess any right to grant the State of New York an easement across Plaintiff's land.

The appropriation of a new easement for an interim public recreational trail and the creation of a new easement for a future railroad corridor across Plaintiff's property is a taking of Plaintiff's property for which the Fifth Amendment to the Constitution requires that the United States pay "just compensation" to Plaintiff property owners.

This action presents the claims by these United States citizens pursuant to the Fifth Amendment and the Tucker Act 28 U.S.C. § 1491(a)(1). Plaintiff seeks "just compensation" for the value of his property taken from him by the federal government through operation of the

---

[1] Plaintiff uses the term "reversionary" because such term was used in the generic sense by the Federal Circuit in *Barclay v. United States*, 443 F.3d 1368 (2006), consolidated on appeal with *Renewal Body Works*. Technically this is not a "reversion" of the property. Rather Plaintiff and its predecessors-in-title always held fee title to the property. Its fee title had been burdened by an easement for operation of a railroad. Upon the railroad's abandonment of this easement, Plaintiff's fee became "unburdened" by this easement. To the extent that "reversionary" is used in this pleading it is used in the generic sense.

2

Trails Act. The "just compensation" he seeks includes compensation for the delay between the date their property was taken (or made subject to the Trails Act) and when the federal government ultimately pays him compensation.

Plaintiff also asks that the federal government pay his attorney fees and expenses incurred in bringing this action pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4654(c).

AFDOCS/10405043.1

## JURISDICTION

1.      This court has jurisdiction pursuant to 28 U.S.C. § 1491(a)(1) ("Tucker Act"), in that this action presents a claim against the United States which is founded upon the Constitution and statutes of the United States.

## STATUTES AND CONSTITUTIONAL PROVISIONS

2.      Plaintiff's claim is governed by the following statutes and constitutional provision:

(a)      The Fifth Amendment to the United States Constitution which provides, "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

(b)      National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act").

(c)      The Tucker Act, 28 U.S.C. § 1491(a) ("Tucker Act") which provides in relevant part, "The United States Court of Federal Claims shall have jurisdiction to render judgment uon any claim against the United States founded upon the Constitution."

(d)      The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c) (2000) provides that just compensation includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

## STATEMENT OF FACTS APPLICABLE TO ALL COUNTS

3.      The rail line at issue is the former Buffalo & Pittsburgh Railroad, Inc. (the "Railroad") line extending 27.6 miles between milepost 8.4 in Orchard Park, in Erie County, New York to milepost 36 in Ashford, in Cattaraugus County, NY (the "right-of-way").

4.      The BR&P originally acquired the right-of-way in the early 1900s.

4

5.      The Buffalo & Pittsburg Railroad acquired the right-of-way in July 1988.  *See Buffalo & Pittsburgh Railroad, Inc. – Exemption of Acquisition and Operation of Rail Line, CSX Transportation, Inc. and Buffalo, Rochester, and Pittsburgh Railway Co.*, ICC Finance Docket No. 31116 (served October 26, 2987).

6.      But, by the 1990s, the Railroad had abandoned the right-of-way. "No local traffic has moved over the lines for at least two years (since 1994)." (*See* Abandonment Exemption, STB Docket No. AB 369 (Sub. No. 7X), a copy of which is attached as "Exhibit 1").

7.      On September 16, 2008, the Railroad filed its request to abandon the right-of-way. *See id.*

8.      On September 22, 2008, the State of New York filed a request for trail use for the right-of-way. (*See* Trail Use Request dated Sept. 22, 2008, STB Docket No. AB 369 (Sub. No. 7X), a copy of which is attached as "Exhibit 2").

9.      On October 17, 2008, the Erie Cattaraugus Rail Trail, Inc. ("ECRT") also filed a request for trail use for the right-of-way. (*See* Trail Use Request dated Oct. 16, 2008, STB Docket No. 369 (Sub. No. 7X), a copy of which is attached as "Exhibit 3").

10.     On October 31, 2008, the Western New York Railway Historical Society, Inc. ("WNYRHS") filed their comments in opposition to the planned abandonment by the Railroad of the right-of-way. (*See* Opposition dated Oct. 31, 2008, STB Docket No. 369 (Sub. No. 7X), a copy of which is attached as "Exhibit 4"). The WNYRHS objected to the planned abandonment of the right-of-way for several reasons:  (1) "The WNYRHS [was] never [] formally notified of the planned abandonment"; (2) the abandonment would interfere with a "major rail-oriented event" that "was estimated to draw nearly 15,000 to the site to ride the trail and support the ongoing restoration of the [historic depot].  It would have also provided revenue to the railroad

5

and [sic] well as providing a significant economic impact in the village"; (3) "The WNYRHS has also been a shipper on the railroad"; and (4) "the WNYRHS currently has a historic baggage car sitting on the active siding that will be landlocked upon the abandonment." *See id*, p. 3. The "WNYRHS desire[d] to maintain active railroad service to the station property. [They felt] that the historic context and nature of this National Register site will be **adversely affected** by the lack of the ability to host rail oriented events. [The WNYRHS] request[ed] that the railroad continue to provide rail service to the site." *Id.*, p. 4 (emphasis in original).

11.     In response, the Railroad requested the STB dismiss the WNYRHS letter or deny its request. And, the STB ultimately agreed with the Railroad and denied the WNYRHS's request to reject the Railroad's petition for abandonment.

12.     On November 4, 2008, the STB issued the NITU, which authorized the Railroad to negotiate trail use with the State of New York. (*See* NITU, STB Docket No. AB 369 (Sub. No. 7X), a copy of which is attached as "Exhibit 5").

13.     The State of New York has not been authorized by the federal Surface Transportation Board to operate a railroad.

14.     The National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act"), provides, "in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."

15.     But for operation of the Trails Act, Plaintiff would have the exclusive right to physical ownership, possession, and use of his property free of any easement for recreational trail use or future railroad use.

16.     The United States Supreme Court in *Preseault v. United States*, 494 U.S. 1 (1990) (*Preseault I*), held that Congress possessed the constitutional authority to enact the Trails Act and to take Plaintiff's property for conversion to a public-access recreational trail and preservation of a railroad easement for a possible future railroad corridor.

17.     However, the Supreme Court in *Preseault I* and the Federal Circuit sitting *en banc* in *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) (*Preseault II*), held that the Fifth Amendment to the United States Constitution requires the United States to pay the property owners for the value of that property taken by operation of Section 8(d) of the Trails Act.

18.     To wit, Justice O'Connor wrote in *Preseault I*:

[The Trails Act] provides that interim trail use "shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." This language gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests, subject of course to the ICC's "exclusive and plenary" jurisdiction to regulate abandonments, and to impose conditions affecting postabandonment use of the property. By deeming interim trail use to be like discontinuance rather than abandonment, Congress prevented property interests from reverting under state law.

*Preseault I*, 494 U.S. at 8 (internal citations omitted).

19.     The U.S. Court of Appeals for the Federal Circuit in *Preseault II*, held:

[W]e conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government...In the case before us there was a similar physical entry upon the private lands of the [property owners], acting under the Federal Government's authority pursuant to

the ICC's [now STB's] Order. That it was for a valued public use is not the issue. We here have a straightforward taking of private property for a public use for which just compensation must be paid.

*Preseault II*, 100 F.3d at 1531, 1551.

20. The Federal Circuit in *Ellamae Phillips Co. v. United States*, 564 F.3d 1367 (Fed. Cir. 2009), held that determination of whether the federal government is required to pay compensation for a Trails Act taking requires this Court to answer the following three questions:

(1) [W]ho owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate;

(2) [I]f the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and

(3) [E]ven if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

21. The property over which the abandoned Railroad right-of-way is located is valuable property.

22. Creating a public-access recreational trail across Plaintiff's property and appropriating a new easement for possible future railroad use has taken from Plaintiff the value of the land physically appropriated for this trail corridor and greatly diminished the value of the Plaintiff's property adjoining this trail corridor.

23. The value of the property interests taken from the Plaintiff is substantial.

24. The Federal Circuit in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), and *Barclay v. United States*, 443 F.3d 1368 (2006), held that claims for compensation arise upon the date that the Surface Transportation Board issued the NITU. Specifically, Judge Dyk of the Federal Circuit wrote:

The taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. Abandonment is suspended and the reversionary interest is blocked "when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)" of the Trails Act. We concluded that "[t]he issuance of the NITU is the only government action in the rail banking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way." Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU.

*Barclay*, 443 F.3d at 1373 (Judge Dyk citing his own prior decision in *Caldwell* as authority).

25.     The United States Constitution requires the federal government to pay "just compensation" to all those property owners holding fee title to property that was subject to the NITU.

26.     This compensation is due from the federal government, not the State of New York. *See Preseault, II*, 100 F.3d at 1531("Finally, we conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government").

## THE PARTIES

Joseph A. Deck, Jr.

27.     Mr. Deck acquired property in Erie County on December 11, 2001 by that deed recorded in the Erie County Clerk's Office in Book 10994, Page 4736 (the "Deck Property"). (A copy of the deed by which Mr. Deck acquired his property is attached as "Exhibit 6.")

28.     The Deck property is identified by Erie County as parcel number 1460891610600001008000.

29.    The Deck Property abuts and underlies the former Railroad right-of-way, which is now subject to an easement for an interim public-access trail and possible future railroad reactivation.

30.    Mr. Deck owned his property on November 4, 2008.

31.    Mr. Deck had no knowledge of the Railroad's planned abandonment prior to the issuance of the NITU on November 4, 2008.  Indeed, Mr. Deck only recently became aware of the government's taking of his property on November 4, 2008.

<u>Class Members</u>

32.    This Plaintiff brings this action individually and as the champion and representative of his similarly situated Erie and Cattaraugus Counties, New York property owners whose land was also subject to the November 4, 2008 NITU.

## THE TRAILS ACT IS A TAKING OF PLAINTIFFS' PROPERTY BY THE FEDERAL GOVERNMENT

33.    Part of the property owned in fee by Plaintiff was formerly subject to an easement for railway purposes.

34.    The easement did not provide the Railroad, or any other person or entity, the right to use Plaintiff's property for a public-access recreational trail.

35.    The New York state courts, as well as the STB, have recognized that under New York law the easement granted to the BR&P and its successors-in-interest is not a grant of fee title but only an easement for use of the property to operate a railroad.

36.    When the railroad abandoned operation of a railroad over the property upon which the right-of-way easement has been granted, the property "reverts" to the fee owner and the fee owner's property is unencumbered by any easement for current or future railroad use. *Id.*

AFDOCS/10405043.1

37.    The Trails Act allows the conversion of abandoned railroad rights-of-way for use as interim public-access recreational trails and preserves the right-of-way for possible future reactivation as a railroad.

38.    The Trails Act further provides that such conversion to trail use "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes" 16 U.S.C. § 1247 (d).

39.    Prior to the NITU, Plaintiff's property had never – at any time – been subject to an easement allowing the public to use Plaintiff's property for a recreational trail.

40.    Plaintiff's property has never been subject to a general right of the public to cross or make use of his property for any purpose.

41.    Any easement for operation of a railroad across Plaintiff's property has been abandoned and Plaintiff enjoyed under New York law the right to use and occupy his property free of any present or future easement for operation of a railroad across his land.

42.    The federal government, through operation of the Trails Act and issuance of the NITU has: (a) forestalled or taken from Plaintiff's state law "reversionary" right to his property; (b) appropriated an easement across Plaintiff's property for an interim public-access recreational trail, and (c) appropriated an easement for a potential future railroad right-of-way across Plaintiff's property and has taken from Plaintiff the rights he enjoys under New York law to the exclusive use and physical occupation of his land.

43.    Pursuant to the decision of the Federal Circuit in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004) and *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006), this taking of Plaintiff's property occurred when the STB issued the NITU on November 4, 2008.

44.     According to the Federal Circuit, the date upon which the value of the property taken from Plaintiff is to be established is the date of the NITU, November 4, 2008.

45.     The United States has neither instituted any condemnation proceeding against Plaintiff, nor paid, nor offered to pay, Plaintiff for the property taken from him.

## SPECIFIC CLAIM FOR RELIEF

## COUNT ONE

### A Claim For "Just Compensation" For
### The Permanent Physical Taking of Plaintiffs' Property Subject to the NITU

46.     Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 - 45 of this Complaint.

47.     The United States of America is a republic and the actions and laws of the federal government are subject to the Constitution of the United States.

48.     The Fifth Amendment to the Constitution of the United States, "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

49.     The Fifth Amendment prohibits the United States from taking private property from a citizen without paying that citizen "just compensation."

50.     The Fifth Amendment requirement of paying "just compensation" to a property owner from whom the government takes property includes the obligation of the government to pay the property owner: (a) the fair market value for the property taken as of the date it was appropriated by the federal government — this fair market value includes not only the value of the land actually physically confiscated but also any "severance damages" or loss in value to the property owner's entire parcel caused by the government's taking, (b) payment of an additional

amount of delay damages necessary to compensate the property owner for the government's delay in paying the property owner "just compensation."

51.   According to the Federal Circuit, the "date of taking" upon which the government's obligation to pay delay damages begins to run is the date of the NITU, which in this case is November 4, 2008.

52.   The Tucker Act, 28 U.S.C. § 1491(a)(1) provides in relevant part, "The United States Court of Federal Claims shall have jurisdiction to render judgment on any claim against the United States founded upon the Constitution."

53.   The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654 (c) provides that just compensation includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

54.   The actions of the United States have resulted in the taking of Plaintiff's property, by reason of the direct physical taking of Plaintiff's property and by reason of the damage to Plaintiff's remaining adjacent property which has suffered a loss of privacy and other severance damages as a result of the proximity of the public on the adjoining trail. The remaining property is also less valuable by reason of being perpetually encumbered by an elevated easement for trail use and possible future railroad use.

**THIS IS A CLASS ACTION BY THE NAMED PLAINTIFF ON HIS OWN BEHALF AND AS REPRESENTATIVE AND CHAMPION FOR SIMILARLY SITUATED ERIE AND CATTARAUGUS COUNTIES, NEW YORK LANDOWNERS**

55.   Plaintiff requests that this action be certified as a representative class action pursuant to RCFC 23, and that he be named class representative on behalf of similarly situated Erie and Cattaraugus Counties, New York landowners.

AFDOCS/10405043.1

56.    This action satisfies the procedural requirement of RCFC 23 because: (a) the class is so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to the class; (c) the claims of the named Plaintiff is typical of the claims of the class; and (d) the named Plaintiff and his counsel will fairly and adequately protect the interests of the class.

### SPECIFIC RELIEF REQUESTED

Plaintiff respectfully requests a judgment in his favor as follows:

1.    Certifying that this action may be maintained as a class action on behalf of all Erie and Cattaraugus Counties, New York landowners whose property or "reversionary" interest in their property was subject to the NITU issued November 4, 2008.

2.    Awarding Plaintiff the full fair-market value of the property taken by the government on the date it was taken (including any "severance damages" suffered by Plaintiff in loss of value to Plaintiff's remaining property not actually physically taken but affected by the taking);

3.    Compensation for the delay between the date of the government's taking of Plaintiff's property (which is the date of the original NITU according to the Federal Circuit's opinion in *Caldwell v. United States*, 319 F.3d 1226 (Fed. Cir. 2004)) and the actual date when the government finally pays "just compensation" to Plaintiff;

4.    Paying Plaintiff's costs and attorneys' fees incurred pursuant to The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654(c) (2000) which provides that just compensation includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

5.      Such further relief as this Court may deem just and proper.

Date: October 10, 2013                      Respectfully submitted,

                                            ARENT FOX LLP

                                            Mark F. ("Thor") Hearne, II
                                            Lindsay S.C. Brinton
                                            Meghan S. Largent
                                            112 South Hanley Road, Suite 200
                                            Clayton, MO  63105
                                            Phone: (314) 296-4000
                                            Fax:    (202) 857-6395
                                            thornet@ix.netcom.com
                                            brinton.lindsay@arentfox.com
                                            largent.meghan@arentfox.com

                                            1050 Connecticut Avenue, NW
                                            Washington, DC 20036-5339
                                            Phone: (202) 857-6000

                                            Debra J. Albin-Riley
                                            Arent Fox, LLP
                                            555 West Fifth Street, 48th Floor
                                            Los Angeles, CA 90013
                                            Phone: (213) 629-7400
                                            Fax:    (213) 629-7401
                                            riley.debra@arentfox.com

                                            *Attorneys for Plaintiff*

AFDOCS/10405043.1